[No. F003176. Fifth Dist. Mar. 7, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
SHERRY E. COMBS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Parts I(A), II(A), II(B), II(C), II(E), II(F) and II(G) are not published as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

**COUNSEL**

William Bud Walls II, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Garrett Beaumont, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**RANDALL, J.**\*—On May 10, 1983, an information was filed in Tulare County Superior Court alleging that defendant, Sherry Elaine Combs, had committed three felony violations of the Health and Safety Code. Count I charged manufacture of phencyclidine (Health & Saf. Code, § 11379.5), count II possession of phencyclidine for sale (Health & Saf. Code, § 11378.5), and count III possession of cocaine (Health & Saf. Code, § 11350). The information contained various enhancing allegations which were subsequently stricken.

Defendant filed an unsuccessful motion to suppress evidence pursuant to Penal Code section 1538.5, which was heard by the Honorable Kenneth E. Conn. Thereafter she was tried by a jury before the Honorable N. O. Bradley, was convicted of all three counts, and was subsequently sentenced to state prison.

## I. FACTS

Because defendant alleges error in denying the motion to suppress evidence as well as in the conduct of the trial, we shall separate our discussion of the facts to distinguish those adduced at the motion hearing from those developed at trial.

### A. MOTION TO SUPPRESS EVIDENCE†

### B. TRIAL

The trial testimony of the sheriff's deputies concerning their arrival at and entry of defendant's residence on March 15, 1983, was essentially identical to that presented at the time of the motion to suppress evidence.

The officers searching the residence discovered and seized a cigarette in a vial in defendant's purse which preliminary tests indicated contained phen-

---

\*Assigned by the Chairperson of the Judicial Council.
†See footnote, *ante,* page 422.

cyclidine.[1] Also seized were a foil bindle containing .6 grams of a powder containing cocaine (found in defendant's refrigerator), a cigarillo box[2] containing cigarette fragments, some of which were of a hand rolled cigarette containing marijuana (found in a dresser in a bedroom of the residence) and a device for smoking marijuana (found in the same location as the cigarillo box).

The building 50 feet from the residence contained a kitchen sink, refrigerator, shower, toilet, and bathroom sink. It had electrical power, but there was no evidence that anyone resided there. Inside were found numerous buckets containing residue, magnesium turnings, aluminum foil, iodine crystals, hydrochloric acid, a glass beaker, ether and petroleum ether, lye and other chemical equipment.

The building 70 feet from the residence was a storage shed with a dirt floor. In it were discovered a brown bottle containing eight cubic centimeters of ether solution containing phencyclidine, and about two pounds of PCC, a chemical precursor of phencyclidine.

The building 200 feet from the main residence had a dirt floor and tin roof. In it were found hydrochloric acid, distilled water, iodine crystals, sodium bisulfite, sodium cyanide and magnesium turnings.

In two areas near the above-described buildings the officers discovered freshly dug holes in the ground which when excavated revealed small plastic baggies containing PCC residue, containers with lye and ammonia residue, and paper towels that had been soaked.

A criminalist testified extensively as to the chemical process involved in the manufacture of phencyclidine, noting that all the necessary constituents and equipment were present among the items found in the various outbuildings to transform the two pounds of PCC into an almost equivalent amount of phencyclidine, with the exception of one necessary chemical, bromobenzene. The discovery of soaked paper towels was consistent with the manufacture of phencyclidine, since use of such towels is common in separating PCC crystals from the solution in which they are formed during the manu-

---

[1]The criminalist who examined this cigarette testified that his preliminary screening tests on the tip of the cigarette indicated the presence of phencyclidine, but "on the conclusive tests I was not able to establish definitely that compound was phencyclidine on [the cigarette]."

[2]Detective Matthews testified that the brand of cigarette found in the box was a type usually associated with phencyclidine use, because its brown paper did not readily show evidence of "tampering."

facturing process. While some of the substances seized had agricultural uses in minute quantities, the manner in which these chemicals were packaged indicated that they were not being utilized for agriculture. The criminalist further testified that one would not need to know how various chemicals react with other chemicals in order to manufacture phencyclidine, since "[y]ou could follow a recipe just as you would when making a cake."

The letter carrier responsible for defendant's address testified that since he began servicing that route in October 1982, he had never delivered mail to anyone at defendant's property except defendant, and had never observed anyone else living there.

Defendant's sister, Marsha Traylor, testified that she last visited her sister in mid-February 1983, and saw a black man named Harry living in the outbuilding immediately behind the main residence on defendant's property. She had seen other agricultural laborers living in the outbuildings at various times throughout the year.

## II. DISCUSSION

In her opening brief defendant raised three issues with regard to denial of the motion to suppress evidence, and three with regard to the trial. In her reply brief she raised an additional issue for the first time concerning the failure of the court to give appropriate instructions to the jury with regard to a lesser included offense. We consider these allegations in the order in which they were briefed.

### A. DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED UPON AN ASSERTED FAILURE BY THE POLICE TO COMPLY WITH "KNOCK-NOTICE" REQUIREMENTS?*

### D. WAS DEFENDANT'S CONVICTION FOR MANUFACTURE OF PHENCYCLIDINE SUPPORTED BY SUFFICIENT EVIDENCE?

■ Because evidence at trial established that one chemical essential for the manufacture of phencyclidine—bromobenzene—was not found among the various items seized at defendant's residence, defendant argues that she could not validly be convicted of manufacture of the controlled substance; that is, since it would have been impossible to manufacture phencyclidine with the materials present at her residence, there was insufficient evidence to convict her of a penal statute punishing manufacture.

■ To bolster her argument, defendant quotes the text of jury instruction No. 17, given at trial of this matter. It contains the following sentence: "To

---

*See footnote, *ante,* page 422.

reach a finding of guilt, you must find beyond a reasonable doubt that defendant manufactured phencyclidine *and had the present means to produce phencyclidine.*" (Italics added.)

Instruction No. 17 was a special instruction and cited as its authority the hoary case of *Anheuser-Busch Brew. Asso.* v. *United States* (1907) 207 U.S. 556 [52 L.Ed. 336, 28 S.Ct. 204]. However, a careful reading of that opinion fails to turn up any language supporting the statement underlined above. Neither does a reading of Health and Safety Code section 11379.5 lead us to conclude that the word "manufactures" as used therein was meant to connote a word of art having a meaning apart from that attributed to it in general usage.

The dictionary definition of "manufacture" is "the making of goods and articles by hand or, esp., by machinery." (Webster's New World Dict. (2d college ed. 1970) p. 864.) The Health and Safety Code does not define the word as used in section 11379.5, but in a very similar context in the California Imitation Controlled Substances Act, it does define manufacture to mean (among other things) ". . . the production, preparation, compounding, processing, . . . of an imitation controlled substance." (Health & Saf. Code, § 11674.)

■ In the instant case, the *end product* of the manufacturing process—phencyclidine—was present in the brown bottle seized along with the PCC and other materials in the outbuilding 70 feet from defendant's main residence. It can hardly be argued that the absence of an intermediate substance prevents manufacture of an end product when that end product itself is present at the manufacture site. The bromobenzene may have been consumed in the manufacturing process or may have been discarded or lost after the process had been completed; neither is significant. The presence of nearly all the necessary equipment and materials to manufacture phencyclidine, *plus* a quantity of the actual substance, establishes beyond question that the manufacturing process had taken place.

The rules governing appellate review for sufficiency of evidence are well known and need not be detailed under these circumstances. (See, e.g., *People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 577-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In the present case, the evidence that phencyclidine manufacturing had taken place was overwhelming.

E. Was Defendant's Conviction of Possession of Phencyclidine for Sale Supported by Sufficient Evidence?*

## III. Conclusion

The judgment is affirmed.

Franson, Acting P. J., and Woolpert, J., concurred.

---

*See footnote, *ante*, page 422.