[No. B037281. Second Dist., Div. Five. Mar. 22, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND JACKSON et al., Defendants and Appellants.

## COUNSEL

E. Stephen Temko, under appointment by the Cout of Appeal, Donald M. Re and Mona C. Soo Hoo for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Assistant Attorney General, John R. Gorey and Robert David Breton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BOREN, J.—John Coley, Peter Coley, and Raymond Jackson were each convicted after a court trial of one count of manufacturing phencyclidine (PCP). (Health & Saf. Code, § 11379.6, subd. (a).) On appeal, all three appellants contend that the police officers unlawfully stopped and detained them and had insufficient facts from which to reasonably believe they were involved in criminal activity. Appellants John and Peter Coley additionally urge that, after the detention, no exigent circumstances existed sufficient to justify the warrantless search of the goat ranch, the site of the PCP manufacturing operation. All three appellants also contend that the evidence of manufacturing was insufficient because no PCP was discovered at the site, and appellants John and Peter Coley further urge that the preliminary hearing magistrate's ex parte view of the site requires reversal of their convictions. We reject the contentions and affirm.

### FACTS[1]

On April 16, 1985, Los Angeles Police Officers Roy D. Wunderlich and William Felix and two other officers surreptitiously observed patrons

---

[1] Appellants' court trial was submitted on the transcripts of the preliminary hearings, the hearing on the motions to suppress and several evidentiary stipulations. The waiver of a jury trial and the submission on transcripts were with the understanding that the court would

leaving the Chem Shed, a wholesale and retail chemical supply house in Canoga Park. The Chem Shed was under surveillance in conjunction with a federal investigation to document probable cause for a federal wiretap warrant. Officer Wunderlich had participated in the surveillance and investigation of approximately 50 persons who had purchased chemicals at the Chem Shed and who were subsequently arrested and convicted of manufacturing dangerous drugs.

At approximately 4 p.m. on April 16, 1985, Officers Wunderlich and Felix saw Raymond Jackson arrive at the Chem Shed, visit the sales office and then back his car up to the warehouse where Jackson and a salesperson loaded 8 five-gallon green cans and a cardboard box into the trunk of his Ford LTD car. The label on the cans indicated the contents were flammable. They were similar to other cans sold by the Chem Shed, which the officers knew contained ether. Officers Wunderlich and Felix, who worked in the clandestine lab squad of the police narcotics division, had extensive training and experience regarding the manufacture of PCP and other dangerous drugs and had been involved in several hundred investigations and seizures of clandestine drug labs. The officers believed that the eight cans loaded into Jackson's trunk contained forty pounds of ether which could be used to make PCP.

Jackson drove the Ford LTD to a nearby gas station. He parked the car at the rear of the gas station and watched the traffic pass by for approximately five minutes, as if checking to see if he was being followed. Jackson then drove to an apartment complex in South Los Angeles with the officers surreptitiously following him. Jackson's car remained parked at the same location for the next 26 hours. During that period of time, someone in a Cadillac stopped and loaded two boxes into the Ford LTD, but no one took anything out of the vehicle.

On April 17, 1985, at approximately 7:45 p.m., as Jackson and another person drove off in the Ford LTD, they were immediately joined by an orange Nissan pickup truck with two occupants. The two vehicles drove in tandem north on the freeway. Officers Wunderlich and Felix, as well as five other officers, followed the two vehicles which engaged in various counter-surveillance maneuvers, apparently attempting to determine if they were being followed. The Nissan pickup truck soon left the freeway, but the Ford LTD continued north to the Palmdale area and then to the Antelope Valley near Lake Hughes, approximately 80 miles from Los Angeles. At Muntz Ranch Road and Aqueduct Highway, a yellow pickup truck with no license

dismiss two of the three counts, one count of conspiring to manufacture PCP (Health & Saf. Code, §§ 11378.5, 11379.6, subd. (a)) and one count of possessing chemicals with intent to manufacture PCP (Health & Saf. Code, § 11383, subd. (b)).

plates joined Jackson's Ford LTD. Both vehicles drove several miles down Muntz Ranch Road, a dirt connector road, to Fairmont Road, a winding dirt road. They then drove up an access road and steep incline to a goat ranch on a plateau on top of a hill. The Ford LTD and the yellow pickup truck turned off their headlights and parked. The goat ranch was in an isolated high desert area, ideal for the clandestine manufacture of PCP and for the surveillance of any approaching intruders.

Officers Wunderlich and Felix learned that the owner of the goat ranch had been arrested three months before for operating a PCP lab on the premises. The officers set up a surveillance location on top of another hill approximately three miles from the goat ranch. From this vantage point, the officers could see the goat ranch, as well as the dirt road leading up to it, and could identify, with the aid of binoculars and night-vision goggles, the make and color of cars on Muntz Ranch and Fairmont Roads.

During approximately the next two hours, Officers Wunderlich and Felix were in radio communication with a police helicopter and with numerous other officers. During that time the only two vehicles which went up to or down from the goat ranch were the Ford LTD and the yellow pickup truck.

Approximately 20 minutes after those 2 vehicles again reached the goat ranch, the yellow pickup truck drove down a series of dirt roads and then back and forth on Aqueduct Highway, repeating an apparent countersurveillance maneuver and then traveling toward Lancaster. At approximately 11:30 p.m., the pickup truck returned to the general area. However, instead of heading toward the goat ranch, the pickup truck went to the other side of the valley and, as Officers Wunderlich and Felix suddenly realized, drove directly toward their unmarked car. The plainclothes officers moved close to each other and pretended to be lovers to avoid detection. The two occupants of the pickup truck drove alongside the officers' vehicle, approached only six inches away from the driver's side, stared at the officers, and then drove off and returned to the goat ranch.

Fearing that the police surveillance might have been compromised, Officers Wunderlich and Felix moved closer to the goat ranch to determine if the PCP manufacturing operation was already underway. While walking up the hill along the dirt access road, Officer Felix detected the telltale odor of ether associated with manufacturing PCP.[2] The Ford LTD and the yellow pickup truck left the goat ranch. The officers suspected that the people under surveillance may have seen an officer or heard police walkie-talkie

---

[2] PCP, in solid crystalline form, has little or no odor, but its unreacted ingredients and its by-products have the odor of ether or other unreacted starting ingredients.

sounds and decided to flee. After the two vehicles left the dirt roads and entered the Aqueduct Highway, police officers stopped the two vehicles.

John Coley and Peter Coley were in the yellow pickup truck. Both men wore blue plastic jump suits commonly worn by people manufacturing PCP, and one had a pair of protective plastic goggles upon his head. Raymond Jackson and Joseph Jett were in the Ford LTD.[3] All four men emitted a strong chemical odor consistent with the manufacture of PCP and were arrested.

Officer Wunderlich was concerned about the danger of an explosion at the unattended lab site at the goat ranch. He was unable to ascertain from those arrested whether anyone else was at the goat ranch and whether there was any danger of an explosion from any unstabilized PCP component chemicals, which are highly flammable and volatile. Officer Wunderlich summoned assistance from the fire department and from the hazardous chemicals team in the scientific investigations unit of the police department.

When the officers got to the secluded but ungated goat ranch on the mountain plateau, they found a trailer, several lean-tos and goat pens, and a storage shed. The PCP lab was in an open pen. They observed numerous white plastic, five-gallon buckets which contained chemicals in various reaction stages. There were several empty green five-gallon ether cans and two cardboard boxes similar to the ones Jackson had loaded into the trunk of the Ford LTD at the Chem Shed. No PCP was found at the site. However, next to the white buckets were more than 4,600 grams of piperidinocyclohexane carbonitrile (PCC), with a street value of approximately $7 million. PCC is an immediate precursor to PCP and a required ingredient for the manufacture of PCP. The PCC was apparently made elsewhere and brought to the goat ranch.

To manufacture PCP, it is necessary to liquefy PCC by dissolving it in petroleum ether and then to combine this liquid with a grignard reagent made by mixing three other chemicals. When the dissolved PCC solution is added to the reagent, PCP crystals are formed which are then liquefied by adding ether and lye. All of the reagent chemicals and other ingredients needed to manufacture PCP were found at the goat ranch. PCC had already been dissolved in nine buckets, each containing one gallon of petroleum ether which was so volatile that it largely evaporated during the two hours the police were present. The grignard reagents were being produced in 19 other buckets, were at various stages of reaction, and would have been

---

[3] Codefendant Joseph Jett was charged with the same offenses as appellants but pled guilty to a conspiracy charge and is thus not a party to this appeal.

completed in approximately 4 hours. It would have taken approximately 10 hours to have completed manufacturing all the PCP which could have been made with the large quantity of PCC and other ingredients available at the site. In Officer Wunderlich's opinion, the goat ranch site was a fully operational PCP lab which was in the process of manufacturing PCP for sale.

DISCUSSION

I. *The Stop of Appellants and the Search of the Goat Ranch*

A. *The Stop and Detention on Aqueduct Highway*

■ Contrary to appellants' contention, their detention was based on reasonable cause. ■ An officer may stop and briefly detain a suspect for questioning for a limited investigation even if the circumstances fall short of probable cause to arrest. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868]; *In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957].) To justify an investigative stop or detention, the detaining officer must have specific and articulable facts causing him to suspect that some criminal activity has taken place or is occurring and that the person detained was involved in the criminal activity. (*In re Tony C., supra*, 21 Cal.3d at p. 893.) The officer must personally entertain such suspicions which are objectively reasonable. (*People* v. *Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115].)

■ On appeal following the denial of a motion to suppress, the trial court's factual findings, whether express or implied, must be upheld if supported by substantial evidence. (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].) However, the appellate court must independently measure the facts of the search or seizure, as found by the trier of fact, against the constitutional standard of reasonableness. (*Ibid.*; see also *People* v. *Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-598 [174 Cal.Rptr. 867, 629 P.2d 961].)

■ Here, Officers Wunderlich and Felix, experts as to the detection and manufacture of PCP, described numerous factors in support of their decision to detain appellants. Particularly in view of the circumstances of Jackson's suspected purchase of ether, its transportation in a luxury, noncommercial vehicle which engaged in numerous countersurveillance tactics en route to a remote goat ranch owned by a person recently arrested for operating a PCP lab at that site, the detection of the odor of ether near the site, and the feared discovery of the officers' surveillance, all of the events

observed by the officers provided reasonable cause to believe that Jackson was involved in the manufacture of PCP and justified the stop of his vehicle.

The Coleys' vehicle was linked to these activities by the meeting with Jackson's vehicle at the Aqueduct Highway, and by the drive in tandem to the remote hilltop site, ideally suited for the clandestine manufacture of PCP. Furthermore, the Coleys' vehicle engaged in repeated forays up and down the hilltop site, including a countersurveillance drive back and forth on the highway, then to the officers' spying site on a nearby hilltop and then back to the goat ranch.

The circumstances known to the officers thus justified the reasonable and minimal intrusion upon appellants caused by the brief traffic stop. (See *People* v. *Abes* (1985) 174 Cal.App.3d 796, 804 [220 Cal.Rptr. 277]; *People* v. *Divito* (1984) 152 Cal.App.3d 11, 13-14 [199 Cal.Rptr. 278].) Accordingly, the court properly denied the effort to suppress evidence of the telltale odor of ether emanating from Jackson and the Coleys and evidence of the Coleys' peculiar garb associated with the manufacture of PCP.

B. *The Ensuing Search and Seizure of Evidence at the Goat Ranch*

■ Apart from the probable cause to search the ranch which was provided by abundant evidence beyond mere "smell alone" (*People* v. *Duncan* (1986) 42 Cal.3d 91, 103 [227 Cal.Rptr. 654, 720 P.2d 2]) and the exigency urged by the officers from the fear of dangerous and unstabilized chemicals (see *People* v. *Stegman* (1985) 164 Cal.App.3d 936, 944 [210 Cal.Rptr. 855]), the Coleys have no standing to challenge the seizure of evidence found at the goat ranch. The legal theory of vicarious standing, permitting the assertion of the violation of the constitutional rights of another, is no longer viable. (*In re Lance W.* (1985) 37 Cal.3d 873, 879, 887-890 [210 Cal.Rptr. 631, 694 P.2d 744].) The Coleys failed to sustain their burden at the suppression hearing to establish a possessory interest in the goat ranch owned by a third party and a concurrent and legitimate expectation of privacy in the particular property that was seized. (See *Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 105-106 [65 L.Ed.2d 633, 641-643, 100 S.Ct. 2556]; *People* v. *Hernandez* (1988) 199 Cal.App.3d 1182, 1188-1190 [245 Cal.Rptr. 513]; *People* v. *Ooley* (1985) 169 Cal.App.3d 197, 202-203 [215 Cal.Rptr. 112]; *People* v. *Nelson* (1985) 166 Cal.App.3d 1209, 1213-1214 [212 Cal.Rptr. 799].) Particularly in view of the unsecreted and readily viewable nature of the chemicals and the absence of a possessory interest in the site, we find that the trial court properly determined the question of standing.

## II. *Substantial Evidence of Manufacturing PCP, Despite the Absence of PCP*

■ Appellants' contention that the evidence is insufficient to sustain their convictions because of the absence of PCP at the manufacturing site is without merit. Essentially, appellants urge that since the manufacturing process was interrupted by the police before the final stage of production had been reached, they could only have been convicted of attempting to manufacture PCP and not manufacturing PCP within the meaning of Health and Safety Code section 11379.6.[4]

■ The offense commonly referred to as manufacturing PCP actually proscribes not just the manufacturing of PCP but, alternatively, as indicated by the words of the statute itself, the producing or processing or the like of PCP. In interpreting section 11379.6, subdivision (a) and ascertaining the legislative intent, it is only necessary here to turn to the words themselves and view their ordinary and popular meaning in the context of the obvious purpose of the statute. (*People* v. *Aston* (1985) 39 Cal.3d 481, 489 [216 Cal.Rptr. 771, 703 P.2d 111]; *People* v. *Tierce* (1985) 165 Cal.App.3d 256, 269 [211 Cal.Rptr. 325].) As used in section 11379.6, subdivision (a), the words "manufactures," "produces" and "processes" do not have separate technical meanings apart from those attributed to them in general usage. (See *People* v. *Combs* (1985) 165 Cal.App.3d 422, 427 [211 Cal.Rptr. 617].) Both the dictionary definition and the commonsense, everyday usage of these terms entail notions of the ongoing and progressive making, assembly or creation of an item by hand or machine. (*Ibid.*; *People* v. *Tierce, supra,* 165 Cal.App.3d at p. 266.)[5] The ongoing and progressive making, assembly or creation of PCP from its component chemicals may, but does not necessarily by definition, include the culmination of the manufacturing process, the finished PCP product.

---

[4] Health and Safety Code section 11379.6, subdivision (a), on the date of the offense, provided, in pertinent part, as follows: "[E]very person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section . . . 11055 . . . shall be punished by imprisonment in the state prison for three, four, or five years." (Stats. 1985, ch. 3, § 8.) This provision was subsequently amended to increase the punishment to three, five, or seven years. (Stats. 1985, ch. 323, § 1, eff. July 29, 1985.) Health and Safety Code section 11055 includes the chemical PCP. (Heath & Saf. Code, § 11055, subd. (e)(3).)

[5] Dictionary definitions also provide, in large part, a circular redundancy among these words, where one or two of the words is used to define the third. (See Webster's New Collegiate Dict. (9th ed. 1984) pp. 725, 938, 937.) Similarly, the Legislature in other contexts has defined manufacturing to mean making, preparing or processing. (See Health & Saf. Code, §§ 11674, 26019; Pen. Code, § 1203.073; Food & Agr. Code, §§ 14933, 25411, 42512; Lab. Code, § 2650, subd. (a); see also *People* v. *Combs, supra,* 165 Cal.App.3d at p. 427.)

In an analogous situation, the commission of a single, intermediate step in the preparation of marijuana for consumption, i.e., the mere picking of leaves from the stems, has been held to constitute the processing of that controlled substance within the meaning of Health and Safety Code section 11358. (*People* v. *Tierce, supra,* 165 Cal.App.3d 256, 267-269.) Similarly, the conduct proscribed by section 11379.6 encompasses the initial and intermediate steps carried out to manufacture, produce or process PCP. To require that the manufacturer actually complete the finished product, rather than be merely engaged in its completion, would give the words in the statute "a forced and strained meaning contrary to [their] common understanding." (*Id.* at p. 269.) As the trial court aptly stated, section 11379.6, subdivision (a) is violated if the manufacturing, producing or processing of PCP is "occurring," "taking place," and "in the course of its progress."

 Such was the case here. The police found at the clandestine lab site all the chemical ingredients and materials needed to make PCP. The requisite components had already been mixed together and were bubbling and reacting when the police arrived. Thus, the making of PCP was in full swing and would have inevitably resulted in the finished PCP product if the police had not interceded.

The hypertechnical requirement urged by appellants that there be a finished PCP product would also frustrate the specifically declared legislative concern not only for PCP as a dangerous drug, but for the unique dangers from PCP labs "to the general public from fire, explosion, and the toxic chemicals . . . ." (Health & Saf. Code, § 11640; see Health & Saf. Code, § 11644.) As the officers here explained, there is more danger during the processing of the volatile chemicals than after the PCP is finally produced. Police should not be discouraged from aborting PCP labs in progress to the extent that it is safe to do so and consistent with good police work.

Appellant Jackson's reliance upon *People* v. *Combs, supra,* 165 Cal.App.3d 422, and its emphasis on the existence of the finished PCP product is misplaced. In *Combs,* the defendant argued that one chemical essential for the manufacture of PCP was not found among the various items seized, and that the evidence was thus insufficient for the offense of manufacturing PCP. The court found the evidence sufficient because the end product of the manufacturing process, PCP, was present and nearly all the necessary equipment and materials to manufacture PCP were also present. (*Id.* at p. 427.) Although, as in *Combs,* the presence of the end product at a PCP lab is sufficient circumstantial evidence that "the manufacturing process ha[s] taken place" (*ibid.*), even though one of the intermediate ingredients was no longer present, the presence of the end product is not

necessary to establish that the PCP manufacturing process was taking place.

The presence of PCP at the goat ranch site obviously would have provided even more compelling circumstantial evidence of the offense. ██ ██ ██ ██ ██ Nonetheless, the presence of PCP is not an element of the offense of manufacturing PCP, and the offense was otherwise established here by substantial evidence.[6]

## III. *The Preliminary Hearing Magistrate's Improper View of the Lab Site*

██ Appellants John Coley and Peter Coley correctly contend that the preliminary hearing magistrate improperly viewed ex parte the hilltop site of the PCP lab. The magistrate briefly stated in passing on two occasions that at some time during the several-week hiatus between the date of John Coley's preliminary hearing and that of Peter Coley, he "checked" the goat ranch which was the site of the PCP lab "to refresh my memory" and determined that the "place is a mile from every place" and very isolated and rural.

A view is permitted of the "place where any relevant event occurred." (Code. Civ. Proc., § 651, subd. (a)(2); see Pen. Code, § 1119.) However, "[o]n such occasion, the entire court, including the judge . . . court reporter, if any, and any necessary officers, shall proceed to the place . . . . The court shall be in session throughout the view. At the view, the court may permit testimony of witnesses. The proceedings at the view shall be recorded to the same extent as the proceedings in the courtroom." (Code Civ. Proc., § 651, subd. (b).) The magistrate's ex parte view of the PCP lab site was thus improper. (See *Noble* v. *Kertz & Sons Feed etc. Co.* (1945) 72 Cal.App.2d 153, 158 [164 P.2d 257].) To permit a judge to base a finding, even in part, upon an ex parte view of the crime scene would sanction the impermissible taking of evidence outside of court without the presence of the parties and counsel. (*Ibid.*)

---

[6] Nor are the convictions of appellants John Coley and Peter Coley precluded or preempted by the existence of a more specific offense regarding the manufacture of PCC, the PCP chemical precursor. (Cf. *People* v. *Jenkins* (1980) 28 Cal.3d 494, 501-504 [170 Cal.Rptr. 1, 620 P.2d 587].) There was simply no evidence that appellants had manufactured the PCC. In fact, in the expert opinions of two officers, the PCC had likely been manufactured elsewhere and brought to the goat ranch site, and there was no evidence of where it had been manufactured or by whom. Most significantly, PCC and PCP are both legislatively classified as schedule II controlled substances (Health & Saf. Code, § 11055, subds. (e) and (f)) and are both within the ambit of the same statute proscribing their manufacture (Health & Saf. Code, § 11379.6, subd. (a)). Since the same statute proscribes manufacturing PCC and manufacturing PCP, the concept of preemption by another statute is inapplicable.

██ Nonetheless, the error does not warrant reversal of appellants' convictions. The error was of no consequence to John Coley, who was bound over to superior court for trial *prior* to the magistrate's view of the site. John Coley thus did not, and could not, move to set aside the information on the basis of this error by the magistrate, and he is precluded from advancing the argument now. (See *People* v. *Bartlett* (1967) 256 Cal.App.2d 787, 792 [64 Cal.Rptr. 503].)

██ As to Peter Coley, he did move to set aside the information on the basis of the magistrate's error, but the court found the unobjected-to error did not warrant dismissal of the information. The court found the magistrate's view of the scene "improper" but "extraneous" because there was "enough evidence under the standards that apply at the preliminary hearing to hold him to answer." Although the denial of the motion to set aside the information is reviewable on appeal from the judgment (see *People* v. *Flores* (1974) 12 Cal.3d 85, 89, fn. 2 [115 Cal.Rptr. 225, 524 P.2d 353]; see also *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 895 [150 Cal.Rptr. 910, 587 P.2d 706]),[7] the conviction will not be reversed unless the defendant can establish that the error, which here was not jurisdictional, was prejudicial. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941]; *People* v. *Hampton* (1981) 116 Cal.App.3d 193, 199 [172 Cal.Rptr. 25].)

Here, there is no showing that the remarks by the magistrate prejudicially affected the trial court's deliberations prior to its finding of guilt or that the error in any other way deprived the appellant of a fair trial. (See *People* v. *Pompa-Ortiz, supra*, 27 Cal.3d at pp. 529-530; *People* v. *Castaneda* (1987) 190 Cal.App.3d 961, 966-968 [235 Cal.Rptr. 740].) Indeed, the accuracy of the magistrate's improper observation was confirmed by the witnesses' testimony as to the rural and isolated nature of the terrain. The magistrate's description of his own observations was apparently not subject to factual dispute, was essentially neutral and was thus not prejudicial.

### DISPOSITION

The judgment is affirmed.

Ashby, Acting P. J., and Turner, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 11, 1990.

---

[7] A writ of prohibition is also appropriate. (Pen. Code, § 999a; see *People* v. *Carter* (1983) 144 Cal.App.3d 534, 538 [193 Cal.Rptr. 193].)