[No. H010346. Sixth Dist. Sept. 23, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE LANCELLOTTI, Defendant and Appellant.

810

**COUNSEL**

Richard E. Hove and Philip A. Schnayerson for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Richard Rochman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PREMO, Acting P. J.**—Defendant Lawrence Lancellotti appeals from judgment and sentence of five years in state prison for manufacturing methamphetamine. Authorities were notified when the manager of defendant's rented public storage locker noticed an unusual odor. Appellant contends that manufacturing the drug was physically impossible because a necessary piece of equipment and a necessary chemical were not present in the locker; therefore, the contents of the locker were merely being stored. He also contends that the jury was incorrectly instructed. We disagree and affirm.

FACTS

On May 25, 1990, Donna Lewis, the manager of Budget Mini Storage in Milpitas, rented space E-7 to appellant who moved in items that night. No one entered the locker thereafter until June 12, 1990, when Lewis smelled an unusual odor and tried to telephone appellant. The telephone number was not operational (it later turned out that appellant had also given Lewis false license and Social Security numbers), so she used bolt cutters to open the locker. She saw what looked like "a toxic spill." There was "a bunch of

chemicals all spilled together, and glassware. It looked like someone had dumped a bunch of junk . . . ." After a second fruitless attempt to reach appellant by telegram, she notified the fire department.

Appellant was charged with one count of manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a)),[1] and was convicted at a jury trial on August 20, 1992. This appeal ensued.

## ISSUES

Appellant contends first that the evidence is insufficient to show that he was manufacturing methamphetamine because the locker did not contain a piece of equipment (a hydrogenator) and a reducing agent (alcohol) which were necessary for the final step of the manufacturing process. He concludes that "he cannot be considered to be 'manufacturing' when he fail[ed] to possess the ingredients necessary to do so."

Second, he claims that the court erred in refusing to instruct the jury that the manufacturing, producing or processing "is occurring, taking place and in the course of its progress such that methamphetamine would be produced."

## MANUFACTURING

Appellant asserts that a "boxed, non-functioning laboratory was all that was found" and that possession of the items contained in the locker could not even "constitute an attempt" because he did not possess a reducing agent which would transform the intermediate product to methamphetamine.

We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

Evidence produced at trial showed that the manufacture of methamphetamine involves a multistep process which can be accomplished in 24 hours, but which can be interrupted at various stages. When the lab is "bubbling," the chemicals reacting in beakers and tubes produce strong, telltale odors. To escape detection, manufacturers typically move the lab between steps to different locations. Moves typically occur when the lab is "boxed," i.e.,

---

[1]Further statutory references are to the Health and Safety Code unless otherwise stated.

when the process is at an intermediate stage when no chemical reaction is occurring.

As respondent informs us, appellant's storage locker "contained virtually all of the equipment needed to produce methamphetamine," including: face respirators and filter cartridges to protect the manufacturer from the harmful fumes emitted during the process; several vacuum pumps, for separating a powder from a liquid at various stages of the process; vacuum pump oil; two light-bulb stands, used in drying the wet solid produced by the vacuum pump; twelve drying trays, for holding the wet solid during the drying process; oscillating fans, for accelerating the drying process and dissipating odors; three heating mantles, for heating the chemicals used in the process; a rheostat, for controlling the temperature of the heating mantle; a triple-neck, round-bottom reaction vessel, which sits on the heating mantle; seven condenser columns, to connect to the triple-neck reaction vessel; tubing, for cooling the system by circulating water; a triple-beam scale, for measuring the ingredients and the final product; a box of beakers and a funnel; heavy-duty plastic containers; and safety gloves. There was also a paper money counter.

The locker also contained two catalysts used in the manufacture of methamphetamine, palladium and thionyl chloride; a solvent, chloroform; and chloropseudoephedrine in a twenty-pound bag, in a five-gallon metal drum, in several drying trays, and in liquid form in two 5-gallon metal drums.

According to respondent, "[c]hloropseudoephedrine is an immediate precursor of methamphetamine. To complete the process, [it] and palladium . . . would have to be mixed with alcohol and placed in a hydrogenator, a relatively simple step. Although chloropseudoephedrine itself is not illegal, it cannot be purchased commercially and has no use other than in the production of methamphetamine." A 20-pound bag of chloropseudoephedrine would have produced 10 to 15 pounds of methamphetamine with a value of $15,000 to $20,000 per pound.

Two expert witnesses, a special agent with the Bureau of Narcotic Enforcement and a criminalist, each testified that in her opinion the contents of the storage locker were being used to manufacture methamphetamine. The special agent gave the opinion that the lab was "boxed." The criminalist testified that she could not "say that manufacture of methamphetamine was actually taking place at [that] location on June 12th of 1990 . . . ."

Section 11379.6, subdivision (a), provides for the punishment of "every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or

independently by means of chemical synthesis, any controlled substance specified in Section . . . 11055 . . . ."

The evidence in this case clearly establishes that appellant was in the middle of the manufacturing process for methamphetamine, because ". . . the conduct proscribed by section 11379.6 encompasses the initial and intermediate steps carried out to manufacture, produce or process [a controlled substance]." (*People* v. *Jackson* (1990) 218 Cal.App.3d 1493, 1504 [267 Cal.Rptr. 841].)

When appellant cited *People* v. *Jackson* as authority for his second contention on appeal, he apparently did not notice that that case clearly rejects his first contention. *Jackson* discusses *People* v. *Combs* (1985) 165 Cal.App.3d 422 [211 Cal.Rptr. 617], in which, like appellant, ". . . the defendant argued that one chemical essential for the manufacture of PCP was not found among the various items seized, and that the evidence was thus insufficient for the offense of manufacturing PCP. The court found the evidence sufficient because the end product of the manufacturing process, PCP, was present and nearly all the necessary equipment and material to manufacture PCP were also present. (*Id.* at p. 427.)" (*People* v. *Jackson*, *supra*, 218 Cal.App.3d at p. 1504.) The *Jackson* court went on to conclude: "Although, as in *Combs*, the presence of the end product of a PCP lab is sufficient circumstantial evidence that 'the manufacturing process ha[s] taken place' (*ibid.*), even though one of the intermediate ingredients was no longer present, the presence of the end product is not necessary to establish that the PCP manufacturing process was taking place." (*Id.* at pp. 1504-1505.)

Appellant, therefore, is not entitled to acquittal because his clandestine laboratory did not contain in one place "all the chemical ingredients and materials needed to make [a controlled substance]" and was not "bubbling and reacting when the police arrived . . . [; it] would have inevitably resulted in the finished . . . product if the police had not interceded." (*People* v. *Jackson*, *supra*, 218 Cal.App.3d at p. 1504.)

The cumulative nature of the evidence in appellant's case, including the contents of the locker which all taken together are only used in the manufacture of methamphetamine, the presence of chloropseudoephedrine, a substance which cannot be purchased and is used only in the manufacture of methamphetamine, and the odor emanating from the locker, provide substantial evidence that the manufacture of methamphetamine, an incremental and not instantaneous process, was in progress.

## JURY INSTRUCTION

Appellant also claims that the court erred in rejecting his proposed instruction which he based on the "bubbling away" language of *People* v. *Jackson*, *supra*, 218 Cal.App.3d at page 1504. He requested that the jury be told: "Defendant is charged with manufacturing methamphetamine. It is not necessary for the [P]eople to prove the defendant actually produced methamphetamine. [¶] The [P]eople must prove though, that the manufacturing, producing or processing of methamphetamine is 'occurring,' 'taking place' and 'in the course of its progress' such that methamphetamine would be produced." Appellant's argument on appeal concludes: "the law requires either you are in production in the usual sense of the word or have completed the process and have manufactured methamphetamine."

The jury was instructed in the language of section 11379.6, subdivision (a), quoted *ante*, with the addition: "In order to prove the commission of such crime, the following element must be proved: [¶] (1) That a person unlawfully manufactured a controlled substance."

Our discussion of the first contention also disposes of appellant's second point. "The ongoing and progressive making, assembly or creation of [a controlled substance] from its component chemicals may, but does not necessarily by definition, include the culmination of the manufacturing process, the finished . . . product." (*People* v. *Jackson*, *supra*, 218 Cal.App.3d at p. 1503.) Appellant's tidal theory of manufacturing culpability, with liability flowing in during the "bubbling away" stages and ebbing at "boxed" stages, is therefore contrary to the statute. The instruction given is a correct statement of the law.

## DISPOSITION

The judgment is affirmed.

Elia, J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 15, 1993.