Filed 12/17/20  P. v. Johnston CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DONN ALLAN JOHNSTON,<br><br>  Defendant and Appellant. | G058466<br><br>(Super. Ct. No. 17WF2066)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Judge.  Affirmed.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found appellant Donn Allan Johnston not guilty of manufacturing a controlled substance in violation of Health and Safety Code[1] section 11379.6, subdivision (a), but convicted him of a lesser included charge of attempt. Appellant asserts the prosecution's evidence was insufficient to show he had attempted to produce concentrated cannabis via butane extraction. We disagree and affirm the conviction.

## FACTS

On September 26, 2017, Sergeant Jeff Brown, an investigator with the Garden Grove Police Department's special investigations unit, received a citizen complaint of an odd chemical odor emanating from a home located on Morningside Drive; the complainant believed marijuana was being cultivated on the property. Sergeant Brown carried out a "knock-and-talk" investigation of the complaint.[2]

Appellant answered the door, and upon Sergeant Brown's questioning, admitted he was cultivating marijuana. The sergeant asked whether appellant was engaging in a process called butane "honey oil" (BHO) extraction.[3] Appellant answered in the affirmative, and showed Sergeant Brown around the outside of the residence. When he reached the backyard, the officer observed 122 marijuana plants in different stages of growth. Appellant then showed him to the exterior west side of the residence where there were multiple tarps stretched vertically and overhead in order to create a makeshift room. Inside the room was a work bench containing various paraphernalia which was later seized.

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2] A knock-and-talk investigation occurs when law enforcement attempts to make consensual contact with the subject of a complaint in order to investigate the complaint's validity.

[3] BHO extraction is a method of extracting concentrated cannabis from marijuana plants using butane. Individuals engaging in this process primarily extract the concentrated cannabis, also known as "honey oil," by filling tubes with marijuana plant material and pushing butane through a punctured hole in one end of the tube. The butane separates the concentrated cannabis from the plant material and the extracted substance – which contains a much higher grade of THC – is filtered into a receptacle.

Upon seeing the exterior of the residence, Sergeant Brown obtained and executed a search warrant for appellant's home, seizing the plants and some Pyrex dishes containing suspected concentrated cannabis, along with three baby bottles and a large glass tube, all of which contained dried marijuana. The baby bottles and tube all had an open end and a pointed end with a small puncture hole on the back. Sergeant Brown observed a large amount of butane cans on the premises but did not book any of the cans into evidence because department policy prohibited it.

At the Orange County Crime Lab, forensic scientist Michelle Stevens examined the evidence. She scraped a brown substance from a dish and performed multiple tests to identify it. She did microscopic testing, a Duquenois-Levine color test, and two types of gas chromatograph chemical testing. She determined the brown substance was concentrated cannabis.

Appellant was charged with manufacturing BHO, a controlled substance, under section 11379.6.[4] He pleaded not guilty.

Trial occurred on August 20, 2019. Sergeant Brown described for the jury how he found the BHO extraction lab on appellant's property and the items he seized. He recalled observing multiple butane cans and opined that, based on his experience and training, BHO extraction was a dangerous process due to the volatility of butane. He felt appellant's lab seemed particularly dangerous because the tarps did not allow for any air flow.

On cross-examination, Sergeant Brown conceded he had not smelled any butane or gas when he was on the premises, and he had not documented the cans or checked to see if they actually contained butane. He also conceded he had not observed

---

[4] The original felony complaint also alleged child endangerment against appellant; his daughter's bedroom was supposedly not too far from where the BHO extraction lab was located. The trial court granted a defense motion for judgment of acquittal as to that count under Penal Code section 1118.1 and it never went to the jury.

any specific ignition source for the butane. On redirect, however, he said anything from cigarettes to lighters to even static electricity could ignite butane.

Forensic scientist Stevens testified regarding the testing procedures she used to identify the concentrated cannabis. On cross-examination, she admitted she had done a vapors test on the sample she scraped and was unable to detect any butane. However, she clarified on redirect that butane can evaporate very quickly at room temperature even though it occasionally can get trapped in bubbles within softer substances.

The jury was instructed on the charge of manufacturing a controlled substance under section 11379.6 along with a lesser included attempt charge. The jury acquitted appellant of the former but convicted him of the latter. Imposition of sentence was suspended and appellant was placed on three years' formal probation.

## DISCUSSION

Appellant contends the evidence was insufficient to support his conviction of attempt to violate section 11379.6. "In assessing a sufficiency-of-evidence argument on appeal, we review the entire record in the light most favorable to the prevailing party to determine whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Appellant argues the prosecution failed to establish the presence of butane at his residence, and this was a necessary element of the offense. We believe the evidence as a whole, including that pertaining to butane, was sufficient to show he was attempting to manufacture BHO.

Section 11379.6 criminalizes the manufacture, compounding, conversion, production, derivation, processing, or preparation of certain controlled substances "either directly or indirectly by chemical extraction or independently by means of chemical synthesis[.]" (*Id.*, subd. (a).) In enacting this statute, "[t]he Legislature apparently intended to punish more harshly the use of chemicals in the production of controlled

4

substances because of the dangers posed to the public from the use of hazardous substances, such as fires, fumes or explosions." (*People v. Bergen* (2008) 166 Cal.App.4th 161, 170.) BHO extraction is among the processes prohibited by the statute. (*Id.* at p. 179.)

To this statute we apply the law of attempt. "When a defendant acts with the requisite specific intent, that is, with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime (2 LaFave & Scott, Substantive Criminal Law (1986) § 6.2(c)(1), p. 24), and performs an act that 'go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action' (*People v. Kipp* (1998) 18 Cal.4th 349, 376), the defendant may be convicted of criminal attempt." (*People v. Toledo* (2001) 26 Cal.4th 221, 230.)

"'[T]here is a material difference between the preparation antecedent to an offense and the actual attempt to commit it. The preparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made. In other words, to constitute an attempt the acts of the defendant must go so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances. [Citations.]' [Citations.] [¶] . . . [A]n attempt, as distinguished from acts preparatory to that offense, requires 'some appreciable fragment of the crime . . . accomplished.' [Citations.] However, '[a]n overt act need not be the ultimate step toward the consummation of the design; it is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made.' [Citations.]"[5] (*People v. Memro* (1985) 38 Cal.3d 658, 698 [overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2].)

---

[5]  Ironically, section 11379.6 itself criminalizes preparation, though perhaps in a different sense, a fact recognized in *Heath*. (*See Heath*, *supra*, 66 Cal.App.4th at p. 705 ["It is evident from the Legislature's use of . . . all-encompassing language that it intended to criminalize all acts which are part of the manufacturing process, whether or not those acts directly result in completion of the final product."].)

"As simple as it is to state the terminology for the law of attempt, it is not always clear in practice how to apply it. As other courts have observed, '"[m]uch ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparation ends and attempt begins." [Citation.].'" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8.) "Although a definitive test has proved elusive," our Supreme Court has "long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' [Citations.]" (*Ibid.*)

Appellant's intent to engage in BHO extraction was established by his admission to Sergeant Brown in response to questioning. Thus, our only question is whether the evidence at trial was sufficient to convince the jury that slight acts in furtherance of his design had occurred. Appellant maintains the evidence was lacking. He acknowledges the California authorities upholding manufacturing convictions under section 11379.6 even when certain ingredients necessary to create the controlled substance are missing. (See *People v. Lancellotti* (1993) 19 Cal.App.4th 809 [absence of reducing agent to produce methamphetamine]; *People v. Combs* (1985) 165 Cal.App.3d 422 [absence of bromobenzene to produce phencyclidine (PCP)]; *People v. Heath* (1998) 66 Cal.App.4th 697 (*Heath*) [absence of sodium hydroxide in substance detected in suspected methamphetamine lab].) Nevertheless, appellant argues this case is more analogous to *People v. Luna* (2009) 170 Cal.App.4th 535 (*Luna*), in which the First District Court of Appeal overturned a conviction on a lesser included attempt charge under section 11379.6 because there had not been any overt act taken by the defendant "beyond preparation" which could "'be said to be a commencement of the commission of the intended crime. [Citation.]' [Citations.]" (*Luna*, *supra*, 170 Cal.App.4th at p. 543.)

On its facts, we do not believe *Luna* helps appellant. Defendant Luna was stopped in his vehicle for a traffic violation and consented to a search of the vehicle. (*Luna, supra,* 170 Cal.App.4th at p. 538.) The search turned up numerous items useful in

6

the manufacture of hashish[6]: PVC piping, a metal spigot with an open/close valve, a butane burner, glass dishes and almost 300 bottles of butane. (*Ibid*.) He also had in his possession "a small quantity of marijuana and $1,200 in cash." (*Ibid*.) When asked by the arresting officer, Luna "half-heartedly" denied having a hashish lab. (*Ibid*.) At his trial for manufacture of a controlled substance under section 11379.6, Luna testified he had bought the equipment with the intention of making hashish but never attempted to purchase the marijuana he would need. A criminalist testified at trial that Luna would have needed "grocery bags full of marijuana" in order to produce the hashish. (*Ibid*.) The jury handed down the same verdict it did in this case: Luna was not guilty on the manufacturing charge, but guilty on the lesser-included charge of attempt. (*Id*. at p. 539.)

Luna appealed, arguing he had not advanced beyond the preparatory or planning stage. He had not actually taken steps to begin manufacturing hashish and he had not obtained the most essential ingredient he would need – the large quantities of marijuana. (*Luna*, *supra*, 170 Cal.App.4th at p. 540.) After engaging in a thoughtful discussion of the case law, the First District Court of Appeal concluded Luna "had no ability to begin manufacturing hashish" because he still had to assemble components of the manufacturing device and still needed to obtain the marijuana. (*Id*. at p. 543.) Unlike other cases under section 11379.6, there was no evidence of "ongoing manufacturing operations." (*Ibid*.) The process for manufacturing hashish is instantaneous, as opposed to the manufacture of other controlled substances such as methamphetamine which are produced incrementally. (*Id*. at pp. 542-543.) The court did not feel "the line between preparation and an attempt" could be crossed "where the prosecution's evidence shows that a defendant is still engaged in preparatory acts and that there is a complete inability to take even initial steps toward producing the finished product." (*Id*. at p. 543.) It reversed Luna's conviction. (*Id*. at p. 544.)

<hr>

[6]     Hashish is another term for concentrated cannabis, essentially the same substance produced in this case. (*Id.* at p. 538.)

This case is not analogous. The locations in which the two suspects were apprehended is one very big difference, in our view. Appellant was not stopped in his car carrying an incomplete inventory of materials which, at some future point, could be engineered into a hash extraction set-up, as Luna was. There is no evidence in the record of disassembled components on appellant's property at the time of Sergeant Brown's visit. Rather, there was evidence of, as the *Luna* court put it, "ongoing manufacturing operations" – tarps formed into a makeshift room, bottles, dishes, and butane canisters. Appellant had what appeared to be a "lab" on his residential property designated for production of concentrated cannabis.[7] Indeed, the evidence indicated appellant had actually begun the manufacturing process because concentrated cannabis was discovered in one of the glass dishes in the makeshift lab.

Appellant points out what he regards as holes in the prosecution's evidence. Sergeant Brown failed to confiscate, photograph, or document the presence of butane on the property and smelled no butane when he visited. While he saw butane canisters, he did not check to see whether they contained any butane. The forensic analysis did not reveal the presence of butane in the scraped sample. All of this is true. Yet we are nonetheless satisfied the jury had sufficient evidence before it to conclude butane was indeed present. Sergeant Brown testified to having physically observed multiple butane canisters. He explained why he did not book these items into evidence. The labeled canisters were themselves circumstantial evidence of the presence of butane. Even

---

[7]     As the *Bergen* court explained, this was precisely the type of activity the Legislature was concerned about in enacting section 11379.6 because it presented a danger to the public: "The report to the Senate Committee on the Judiciary explained the need for the bill as follows: 'This bill would implement one of the recommendation[s] of the Attorney General's Commission on Narcotics. The Commission found that clandestine drug labs were a major and growing problem. Most labs produced methamphetamines, but PCP and other controlled substances are also being produced. [¶] The sponsor contends that manufacture of these drugs should be punished more severely than sale or possession for sale because of the added dangers attendant to the manufacturing process. These dangers include environmental damage resulting from the disposal of toxic chemicals, *fire and explosions* (*sometimes in residential neighborhoods where the labs often are located*), and increased risk to law enforcement officers who investigate these operations." (*Bergen*, *supra*, 166 Cal.App.4th at p. 171, italics added.) Sergeant Brown testified to his concern about the volatility of the lab on appellant's property.

though no butane was detected in the sample, the forensic scientist testified that it can evaporate at room temperature over time.[8]

And we must re-emphasize the context. Had appellant been discovered sitting in a lawn chair holding marijuana and a labeled can of butane, his criticisms of the prosecution's evidence would have more weight. But he was discovered with a functional BHO extraction lab in his backyard, including labeled butane canisters, and admitted he was engaged in BHO extraction. The jury could draw the necessary inferences without direct evidence of butane, just as they could infer rain showers from observing people carrying wet umbrellas.

We find there was sufficient evidence to support appellant's conviction for attempted violation of section 11379.6.

## DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


IKOLA, J.


GOETHALS, J.

---

[8]     This is in fact the manufacturer's expectation, according to the discussion in *Bergen*. Butane is used as a solvent to separate the concentrated cannabis from the plant material, and once the separation and filtration process occurs, the butane evaporates within about twenty minutes, leaving behind the honey oil. (*Id.* at pp. 165-166.)

9