[No. B203793. Second Dist., Div. One. Aug. 22, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
NIALL PATRICK BERGEN, Defendant and Appellant.

**COUNSEL**

Law Offices of Eric D. Shevin, Eric D. Shevin and Stephen J. Fisch for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson, Keith H. Borjon and Blythe Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NEIDORF, J.**[*]—Niall Patrick Bergen appeals from the judgment entered following his plea of no contest to manufacturing concentrated cannabis, known as "hash oil" or "honey oil," by using butane to extract the resin containing the psychoactive ingredient tetrahydrocannabinol (THC) from marijuana plant material. (Health & Saf. Code, § 11379.6, subd. (a) (section 11379.6(a)).)[1] Bergen contends he should have been charged under section 11358, which addresses processing resin from marijuana, instead of section 11379.6(a). We conclude that when, as here, the method used to extract the marijuana resin was by means of a chemical such as butane, section 11379.6(a) applies over the more general statute punishing marijuana cultivation, harvesting or processing. (§ 11358.) Accordingly, we affirm.

## BACKGROUND

The following evidence was presented at Bergen's preliminary hearing. Sheriff's deputies conducted surveillance of a house on Carolyn Drive in a residential area of Palmdale. Deputies reported they smelled marijuana emanating from the residence as they drove by.

Deputy Sheriff Rich Simmons had been observing the house for several hours on February 15, 2007, when he saw a car pull into the driveway and park. He watched as the garage door opened automatically and the vehicle pulled into the garage. Bergen got out of the driver's side of the car and another man got out of the passenger side. Both men walked over to a corner of the garage where they remained for perhaps a minute or two. From his perspective Deputy Simmons could not see what the two men were doing in the corner of the garage.

---

[*]Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All further undesignated statutory references are to the Health and Safety Code.

After inspecting the corner of the garage, Bergen and his companion got back into the vehicle and left. Deputies stopped Bergen's vehicle minutes later and arrested Bergen and his companion. Deputies seized keys from Bergen's car. One of the keys operated the lock to the door of the house on Carolyn Drive.

Sheriff's deputies secured a search warrant and searched the house on Carolyn Drive. They discovered Bergen used the house as a "grow house." The house was outfitted with 1,000-watt "grow lights" and an air conditioning system operated by an illegally tapped electrical supply. Every room in the house was devoted to marijuana cultivation. Some areas of the house were filled with young plants measuring only six inches high. Other areas housed medium sized plants, one to two feet tall. Other areas had mature four-to-five-foot-tall plants that were blooming and flowering. Overall, the house contained 665 marijuana plants with an estimated street value of over $2 million.

In searching the area of the garage Bergen and his companion inspected, deputies found eighteen 12- to 13-inch-long white plastic tubes, similar to PVC pipe. In the same area of the garage deputies found bottles of butane, including nine full cases of butane. They also found approximately 1,000 glass vials and a few glass bowls containing a greenish residue.

Detective Robert Wagner testified as an expert on the process of extracting resin from marijuana to produce soluble concentrated cannabis, known on the street as "hash oil" or "honey oil." In Detective Wagner's opinion Bergen was operating a "honey oil" extraction lab in the house on Carolyn Drive.

Detective Wagner described the process of manufacturing soluble concentrated cannabis as follows: One-and-a-half-inch-round solid plastic piping is cut into 18-inch lengths. Solid caps are placed on both ends of the 18-inch tubes. A screw-off cap is placed on the top and a single hole is drilled into the top cap. Five to seven small holes are then drilled into the bottom cap and a filtering device inserted. Filters akin to coffee filters are used for this purpose.

Marijuana is then loosely packed into the tube and the top cap screwed onto the tube. The tube is placed upright in a stand. A bottle of butane is inserted into the single hole in the top cap and poured slowly into the tube to allow the butane to draw the oils down through the tube. Butane is a solvent and it extracts the resin from the plant material as the butane flows from the top of the tube to the bottom. A glass dish is placed under the upright tube to collect the filtered residue as it drips through the small holes in the bottom of the tube. This resin extraction and filtering part of the process takes approximately 15 minutes. It requires another 20 minutes or so for the butane to

evaporate, leaving the amber colored concentrated cannabis known colloquially as "hash oil" or "honey oil." When all the butane has safely dissipated, the "honey oil" is then poured into individual glass vials.

Criminologist John Bever testified regarding his analysis of the marijuana and resins seized from the house on Carolyn Drive. He defined concentrated cannabis as a substance that has been processed from the marijuana plant itself, either by physical separation of the resins from the plant material, or by chemical extraction of those resins from the plant material. He explained the psychoactive ingredient in the marijuana resins, or concentrated cannabis, was the cannabinoid tetrahydrocannabinol, known as "THC." He also explained that in the process of making concentrated cannabis, butane acts as a solvent by dissolving the THC and other cannabinoids present in the plant and drawing it out as a liquid. Bever explained that butane is particularly efficient for this purpose. Using butane in the process of extracting marijuana resin also has the added benefit of evaporating quickly and of leaving no odor. One of the risks of using butane, however, is that butane is flammable.

At the conclusion of the evidence Bergen moved to dismiss the charges. He argued the count for manufacturing concentrated cannabis in particular should be dismissed because it could not apply to marijuana. Among other arguments, Bergen asserted the manufacturing process began with marijuana, with the final result a component of marijuana. Because no chemical change occurred, he claimed the charge under section 11379.6(a) for chemical synthesis or extraction did not apply. The court rejected Bergen's arguments and held Bergen to answer on charges of producing concentrated cannabis (§ 11379.6(a)); cultivating marijuana (§ 11358); possession of marijuana for sale (§ 11359); and theft of services (Pen. Code, § 498, subd. (b)).

Bergen moved to dismiss the charges in the trial court. (Pen. Code, § 995.) The court agreed the multiple statutes on the subject of marijuana created a certain ambiguity. The court also acknowledged the dearth of decisional authority clarifying the circumstances in which processing marijuana should be distinguished from the extraction process and thus which punishment should apply to the production of concentrated cannabis. The court nevertheless ruled section 11379.6(a) was appropriately charged in this case based (1) on the statute's specific reference to "marijuana," which by definition includes its resin or concentrated cannabis (§§ 11018, 11006.5), and (2) on the evidence showing Bergen had produced the concentrated cannabis using a process of chemical extraction, an act prohibited by section 11379.6(a). The court accordingly denied Bergen's motion to dismiss.

On the date set for trial, Bergen, as part of a negotiated plea, waived his constitutional rights to a jury trial and entered a plea of no contest to a violation of section 11379.6(a). The court accepted his plea and dismissed the remaining counts. The court imposed a midterm sentence of five years in state prison and imposed related fines and penalty assessments.

Bergen filed a notice of appeal. The trial court issued Bergen a certificate of probable cause on the issue whether section 11379.6(a) validly applied to the production of concentrated cannabis.

## DISCUSSION

Bergen claims section 11379.6(a) does not apply to the production of concentrated cannabis from marijuana. Bergen argues because section 11358 is specific to marijuana processing, it controls over section 11379.6(a)'s general prohibition against the manufacture of controlled substances. He points out the statutory definition of marijuana includes its resin, or concentrated cannabis, and thus its production is more appropriately punished under section 11358. Bergen points out that neither marijuana resin nor concentrated cannabis is specifically listed as a banned controlled substance in any of the schedules listed in section 11379.6(a), which, Bergen concludes, indicates the Legislature did not intend to include concentrated cannabis within its proscriptions. Finally, he asserts, section 11358 and the other existing statutes regulating marijuana were neither abolished nor amended when the Legislature enacted section 11379.6 as one of several legislative provisions to prohibit and punish clandestine drug laboratories. Bergen claims this shows a legislative intent to continue marijuana processing prosecutions solely under section 11358.

*Standard of Review*

The interpretation of a statute presents a pure question of law an appellate court reviews de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

*General Provisions Prohibiting Production of Concentrated Cannabis*

■ The statutory definition of "marijuana" includes its resin containing THC. Section 11018 states, " 'Marijuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; *the resin extracted from any part of the plant*; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. . . ." (Italics added.)

The statutory definition of "concentrated cannabis" is also the resin extracted from marijuana. Section 11006.5 states, " 'Concentrated cannabis' means the separated resin, whether crude or purified, obtained from marijuana."

Section 11358 specifies punishment for, among other prohibited acts, processing marijuana. Section 11358 states, "Every person who plants, cultivates, harvests, dries, or processes any marijuana or any part thereof, except as otherwise provided by law, shall be punished by imprisonment in the state prison."

Based on these provisions, Bergen correctly argues section 11358 applies as a general matter to the extraction of marijuana resin to produce concentrated cannabis.

*Manufacture of Concentrated Cannabis Through Chemical Extraction*

■ Section 11379.6(a) makes it unlawful to engage in the chemical extraction of a substance as part of the process of manufacturing a controlled substance. (*People v. Coria* (1999) 21 Cal.4th 868, 874 [89 Cal.Rptr.2d 650, 985 P.2d 970].) It is an additional statute that prohibits "processing" of "marijuana." Section 11379.6(a) provides, "Except as otherwise provided by law, every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly *by chemical extraction* or independently by means of chemical synthesis, *any controlled substance specified in Section 11054*, 11055, 11056, 11057, or 11058 shall be punished by imprisonment in the state prison for three, five, or seven years and by a fine not exceeding fifty thousand dollars ($50,000)." (Italics added.)

"Marijuana" is listed as a schedule I hallucinogenic controlled substance in section 11054 and is thus included within the scope of section 11379.6(a). (§ 11054, subd. (d)(13).) "Tetrahydrocannabinols," the psychoactive ingredient in marijuana, are also listed as schedule I hallucinogenic controlled substances in section 11054. (§ 11054, subd. (d)(20).) Neither "concentrated cannabis" nor "marijuana resin" is specifically mentioned in the statutory schedules of controlled substances. However, they are both components of marijuana and are thus subsumed within the statutory definition of "marijuana." (§§ 11018 [defining marijuana to include its resin], 11006.5 [defining concentrated cannabis as the resin separated from marijuana].)

Unlike the general prohibitions in section 11358, the focus of section 11379.6(a) is on the particular *processes* employed to produce a controlled substance—by chemical extraction or chemical synthesis.[2] Stated differently, section 11379.6(a) does not simply make unlawful the processing of concentrated cannabis as does section 11358. It prohibits and punishes the specific *means* used to process marijuana plant material into concentrated cannabis. In this sense section 11379.6(a) is a more narrowly drawn statute, covering only specific methods of processing "marijuana"—which by statutory definition includes concentrated cannabis (§ 11018).

■ Section 11358, in contrast, could potentially apply to any number of possible alternative methods for producing concentrated cannabis. Prosecution under section 11358 would be appropriate, for example, if the resin was physically extracted from the marijuana plant through pressure, through a screening process, or by using an ice water method to produce the concentrated cannabis. Similarly, section 11358 would properly apply to the production of concentrated cannabis if the method used was instead by leaching the resin from the plant material by dissolving it in a nonchemical lipid extractor, such as butter. (See generally U.S. Drug Enforcement Admin., Office of Forensic Sciences (May 2005) Microgram Bulletin, vol. XXXVIII, No. 5, pp. 5–6 <http://www.usdoj.gov/dea/programs/forensicsci/microgram/mg0505/mg0505.html> [as of Aug. 22, 2008]; <http://en.wikipedia.org/wiki/Marijuana> [as of Aug. 22, 2008]; <http://marijuanahydro.com/makinghash.html> [as of Aug. 22, 2008].) Section 11379.6(a) properly applies where the production of concentrated cannabis is by means of *chemical extraction* instead. (See *People v. Jenkins* (1980) 28 Cal.3d 494, 501–504 [170 Cal.Rptr. 1, 620 P.2d 587] [prosecution under a general statute is precluded if a more specific statute applies].)

Our conclusion section 11379.6(a) applies to the production of concentrated cannabis by means of chemical extraction is reinforced by a 1991 opinion of the California Attorney General. There the question concerned whether real property used to cultivate marijuana was properly subject to forfeiture. In reviewing various statutes, the Attorney General also analyzed section 11379.6(a) and found it "directed to the chemical production of controlled substances and not their horticultural production." (74 Ops.Cal.Atty.Gen. 70, 75 (1991).) The Attorney General opined that although cultivating marijuana pro-

---

[2] This case concerns only chemical extraction and not section 11379.6(a)'s alternative prohibition on manufacturing controlled substances through chemical synthesis. (Cf., e.g., *People v. Jackson* (1990) 218 Cal.App.3d 1493, 1500, 1503–1505 [267 Cal.Rptr. 841] [PCP production involves the chemical synthesis of multiple reagents].)

duced marijuana "directly," such production was not " 'by chemical extraction' " nor by "chemical synthesis" and thus cultivation fell outside the proscriptions of section 11379.6(a). (74 Ops.Cal.Atty.Gen. at p. 75.)

The Attorney General defined the "chemical extraction" prohibited by section 11379.6(a) as "the process of removing a particular component of a mixture from others present." (74 Ops.Cal.Atty.Gen., *supra*, at p. 76.) The example the Attorney General gave of what would constitute " 'chemical extraction' " under section 11379.6(a) described the very situation presented by this case, namely "the extraction of resinous THC [tetrahydrocannabinol] or hashish from marijuana." (*Ibid.*)

*Punishment for Producing Concentrated Cannabis Through Chemical Extraction*

The Legislature adopted section 11379.6 in 1985 and placed the offense of manufacturing controlled substances into a separate section. The sole expressed purpose of the change was " 'to increase the *penalties* for those who illegally manufacture controlled substances.' " (Historical and Statutory Notes, 40 pt. 2 West's Ann. Health & Saf. Code (2007 ed.) foll. § 11379.6, p. 530, italics added; see also *People v. Coria, supra,* 21 Cal.4th at p. 879.) The Legislature apparently intended to punish more harshly the use of chemicals in the production of controlled substances because of the dangers posed to the public from the use of hazardous substances, such as fires, fumes or explosions. As explained in the Attorney General's opinion, "When section 11379.6 was enacted in 1985 (Stats. 1985, ch. 3, § 8), section 11358 already specifically made it a felony to cultivate marijuana. Section 11379.6 was not necessary to address that situation, but rather the situation presented by the dangers inherent in the chemical production, processing, and preparation of controlled substances. As explained in *People v. Jackson, supra,* 218 Cal.App.3d at 1504: 'There is more danger during the processing of volatile chemicals than after the [substance being made from them] is finally produced.' Thus, the Legislature has expressed not only concern that controlled substances are dangerous in themselves as finally produced, but also for the unique dangers to the general public that arise in the course of their illicit production. (See, e.g., §§ 11640 [legislative findings on clandestine drug labs], 11644 [directive to disseminate information to the public on the dangers created by clandestine drug labs]; *People v. Jackson, supra.*) . . . Nearly from its inception, section 11379.6 has been associated in the legislative mind with addressing the problem of that chemical production. (Cf.

§ 11642 [regarding reimbursement for costs associated with cleaning up toxic waste from clandestine drug labs].)" (74 Ops.Cal.Atty.Gen., *supra*, at pp. 76–77, fn. omitted.)[3]

The legislative history of section 11379.6 further indicates the Legislature decided use of chemicals in producing controlled substances warranted more severe punishment. A report to the Senate Committee on the Judiciary stated that a purpose of the bill was "to deter the operation of clandestine drug laboratories," with another purpose of the bill being to "create a separate offense of manufacturing any controlled substance." (Sen. Com. on Judiciary, com. on Assem. Bill No. 3165 (1983–1984 Reg. Sess.) p. 2, original underscoring.)

The report to the Senate Committee on the Judiciary explained the need for the bill as follows: "This bill would implement one of the recommendation[s] of the Attorney General's Commission on Narcotics. The Commission found that clandestine drug labs were a major and growing problem. Most labs produced methamphetamines, but PCP and other controlled substances are also being produced. [¶] The sponsor contends that manufacture of these drugs should be punished more severely than sale or possession for sale because of the added dangers attendant to the manufacturing process. These dangers include environmental damage resulting from the disposal of toxic chemicals, fire and explosions (sometimes in residential neighborhoods where the labs often are located), and increased risk to law enforcement officers who investigate these operations. In addition, proponents assert that the offense deserves more serious punishment because it starts the entire distribution chain. If manufacturing of controlled substances could be deterred, drug availability would be reduced." (Sen. Com. on Judiciary, com. on Assem. Bill No. 3165 (1983–1984 Reg. Sess.) pp. 2–3.)

The report explained the bill would include within its scope the "manufacture" of concentrated cannabis, or hashish, but not the cultivation of marijuana using chemical fertilizers. The report to the Senate Committee on the Judiciary states, "the bill is intended to cover the chemical manufacturing or processing of controlled substances. As they interpret it, the term would cover the processing of hashish, but would not encompass the sophisticated cultivation of marijuana by use of chemical fertilizers." (Sen. Com. on Judiciary, com. on Assem. Bill No. 3165 (1983–1984 Reg. Sess.) pp. 3–4.)

---

[3] When the Legislature enacted the Clandestine Laboratory Enforcement Program in 1986 it specifically declared "that there has been a recent and rapid expansion in clandestine laboratories illegally producing a variety of controlled substances. These are increasingly sophisticated operations, frequently located in rural areas or working across jurisdictional lines, which pose substantial dangers to the general public from fire, explosion, and the toxic chemicals involved. . . ." (§ 11640.)

The report specifies all controlled substances were included within the prohibition on manufacturing controlled substances. "This bill would make the manufacture of <u>any</u> controlled substance a serious felony punishable by a 3, 5 or 7 year prison term. This approach is to be contrasted with current law which prohibits the manufacture of only selected controlled substances." (Sen. Com. on Judiciary, com. on Assem. Bill No. 3165 (1983–1984 Reg. Sess.) p. 5, original underscoring.)

Assembly Bill No. 3165 (1983–1984 Reg. Sess.), which introduced the measure to add section 11379.6, passed in both the Assembly and Senate in 1984 before it was vetoed at the author's request for unrelated technical reasons. A nearly identical version of Assembly Bill No. 3165 was reintroduced and passed the following year as Assembly Bill No. 252 (1985–1986 Reg. Sess.), enacting section 11379.6. (Stats. 1985, ch. 3, § 8, p. 9; see also Historical and Statutory Notes, 40 pt. 2 West's Ann. Health & Saf. Code, *supra*, foll. § 11379.6, p. 530.)

■   This background serves to reinforce our view that (1) the Legislature intended section 11379.6(a) to apply to the manufacture of "*any* controlled substance" (italics added), including concentrated cannabis when produced through chemical extraction;[4] (2) the "chemical extraction" referred to in section 11379.6(a) would apply, for example, to the use of solvents, but would not include the use of water or fertilizers in the cultivation of marijuana or the horticultural aspects of producing marijuana; and (3) the Legislature intended to punish more harshly the use of chemicals in the manufacture of controlled substances precisely because of the dangers to the public posed by the use of volatile and/or toxic chemicals in the production process.[5]

■   Bergen's acts fit squarely within section 11379.6(a)'s proscriptions.[6] Bergen used the solvent butane to extract marijuana resin in producing

---

[4] The "Except as otherwise provided by law" language at the beginning of section 11379.6(a) may well, as Bergen suggests, constitute an exception for persons and businesses licensed by the California State Board of Pharmacy and registered with the federal Drug Enforcement Administration and/or for persons and entities engaged in the business of dealing with controlled substances who first obtain a permit from the California Department of Justice. (See § 11106, subd. (a).)

[5] Penal Code section 4 states, "The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." We see no reason to apply any different standard of statutory interpretation to a crime in any other code, in this case the Health and Safety Code.

[6] As Bergen correctly points out, the Compassionate Use Act of 1996 (§ 11362.5 et seq.) provides a defense for qualified patients and their primary caregivers to charges of possession of marijuana for personal medical use (§ 11357) and to charges of cultivation of marijuana for medical use (§ 11358). The act, however, provides no defense to a charge of producing concentrated cannabis by chemical extraction. (See § 11362.5, subd. (b)(2) ["Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in

concentrated cannabis. Butane is a flammable solvent as evidenced by its use in cigarette lighters and the like. He manufactured and chemically processed the concentrated cannabis in a lab located in a house situated in a residential community. Bergen's activities thus posed a risk of fire to the residence and to the public at large. Bergen's prohibited activities satisfy the criteria for a conviction of section 11379.6(a) and subject him to its greater penalty provisions. (*People v. Coria, supra*, 21 Cal.4th at p. 879.)[7] Bergen's arguments to the contrary lose sight of the fact he was not simply charged with producing or processing concentrated cannabis from marijuana plant material. He used a flammable solvent in the process of extracting the marijuana resin. It is *this* act—the use of a chemical in the extraction process—which formed the basis of the charge for manufacturing concentrated cannabis under section 11379.6(a).[8]

---

conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes."].) Accordingly, the Compassionate Use Act has no application to the present appeal.

[7] Bergen attempts to refute this conclusion. Bergen claims that to sustain a charge under section 11379.6(a) the evidence must show either a chemical change as a result of the manufacturing process or evidence he started with a substance which was not itself a controlled substance. Bergen points out that he started with marijuana and ended with a component of marijuana and for this reason, Bergen argues, section 11379.6(a) is inapplicable.

Bergen relies on CALCRIM No. 2330 for this argument. CALCRIM No. 2330 states, as an element of a manufacturing offense under section 11379.6(a), that the "defendant engaged in the synthesis, processing, or preparation of a *chemical that is not itself a controlled substance* . . . ." (Italics added.) The quoted language in CALCRIM No. 2330, on which Bergen relies, may well be appropriate in prosecutions for manufacturing methamphetamine. (See, e.g., *People v. Coria, supra*, 21 Cal.4th at pp. 872–873; *People v. Lancellotti* (1993) 19 Cal.App.4th 809, 812 [23 Cal.Rptr.2d 640]; *People v. Glenos* (1992) 7 Cal.App.4th 1201, 1207 [10 Cal.Rptr.2d 363].) However, this language in CALCRIM No. 2330 appears nowhere in section 11379.6(a). Section 11379.6(a) does not *require* that the manufacture of a controlled substance begin with an otherwise innocuous or noncontrolled substance as an element of the offense. It punishes the *use* of chemicals *as part of the process of* producing a controlled substance. "Published jury instructions, . . . are 'not themselves the law, and are not authority to establish legal propositions or precedent. . . . At most, when they are accurate, . . . they restate the law.' [Citation.]" (*People v. Salcido* (2007) 149 Cal.App.4th 356, 366 [56 Cal.Rptr.3d 912].) Thus, to the extent the instruction conflicts with the statute, the statute necessarily controls. (See, e.g., *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 532 [117 Cal.Rptr.2d 220, 41 P.3d 46]; *Butler-Rupp v. Lourdeaux* (2007) 154 Cal.App.4th 918, 926 [65 Cal.Rptr.3d 242].)

[8] Bergen asserts the greater punishment under section 11379.6(a) shocks the conscience, offends fundamental notions of human dignity, and for this reason constitutes cruel and unusual punishment under the state and federal Constitutions. (Citing *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) Bergen's argument is insufficiently developed to permit adequate review. In any event, the two additional years he received as punishment for having produced concentrated cannabis by chemical extraction (§ 11379.6(a)), rather than through other means (§ 11358), is amply justified by the danger his activities posed to the public at large from having used a highly flammable and volatile solvent in a residential setting in the process of manufacturing concentrated cannabis.

## DISPOSITION

The judgment is affirmed.

Mallano, P. J., and Rothschild, J., concurred.