Filed 10/16/14  P. v. Curtis CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DALE ALAN CURTIS,<br><br>        Defendant and Appellant. | C071952<br><br>(Super. Ct. No. MC YK CR BF 08-0001109-002.) |

Defendant Dale Alan Curtis was convicted of manufacturing concentrated cannabis.  (Health & Saf. Code, § 11379.6, subd. (a))[1] and cultivating marijuana

---

[1] Further undesignated statutory references are to the Health and Safety Code unless otherwise apparent from the context.

1

(§ 11358).[2]  Concentrated cannabis is the "separated resin, whether crude or purified, obtained from marijuana."  (§ 11006.5.)  The sole issue tendered on appeal regarding the manufacturing conviction is whether a solution of particulate marijuana and isopropanol alcohol is concentrated cannabis.  We hold that such a solution is not concentrated.  The defendant was also tried below on the theory that he was in the process of manufacturing concentrated marijuana, but no evidence was tendered as to how concentrated cannabis could be manufactured using isopropanol alcohol.

Defendant appeals, contending (1) there is insufficient evidence to support his conviction for manufacturing concentrated cannabis; (2) the trial court prejudicially erred in failing to define the term "primary caregiver" in connection with the cultivation offense; (3) a $145 laboratory analysis fee is unauthorized and must be reduced to $100; and (4) the case should be remanded to the trial court for a determination as to whether it would have refrained from imposing the $145 drug program fee had it understood the fee was not mandatory.

We shall conclude that the jars of isopropanol alcohol and marijuana seized from defendant's property do not constitute concentrated cannabis as a matter of law, and that there is insufficient evidence to support the prosecution's alternative theory that defendant was in the process of manufacturing concentrated cannabis.  We shall reverse defendant's conviction for manufacturing concentrated cannabis and direct the trial court to enter a judgment of acquittal as to that offense.  We shall further conclude that any

---

[2]  Defendant was found not guilty of possessing marijuana for sale (§ 11359) and not guilty of the lesser included offense of possessing less than one ounce of marijuana (§ 11357) and the jury found not true two firearm use allegations.  (Pen. Code, § 12022, subds. (a)(1), (c).)  The trial court suspended imposition of sentence and placed defendant on three years' formal probation on the condition, among others, that he serve 90 days in county jail.  The trial court also ordered defendant to, among other things, pay a $145 criminal laboratory analysis fee (§ 11372.5) and a $145 drug program fee (§ 11372.7).

error in failing to instruct the jury on the definition of "primary caregiver" was harmless, the $145 laboratory analysis fee must be reduced to $50, and the $145 drug program fee must be reversed and the matter remanded for a determination as to whether defendant had the ability to pay it. We shall otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Prosecution's Case-in-chief*

In 2008 defendant was released from custody on bail and on his own recognizance on the condition, among others, that he "submit [his] person, places, and things under [his] custody or control, or in which [he] ha[s] an interest, to search and seizure by any peace officer at any time of the day or night with or without probable cause, and with or without a warrant."

Pursuant to that search condition, on August 31, 2010, peace officers from various law enforcement agencies, including the Siskiyou County Sheriff's Office, searched a residence, travel trailer, and garden area located at 64626 Highway 96 in the Happy Camp Township and seized 7 bags of marijuana, 1 bag of "marijuana shake," 18 mature marijuana plants, 7 small "starter plants," 42 "clones,"[3] 2 immature plants in "potters," and 10 plants that appeared to be grown from seed. The 18 mature plants would have produced approximately 36 pounds of marijuana. Officers also found two mason-type jars containing a liquid and what appeared to be marijuana in a trailer on the property. Under a sink in the trailer, officers found cans of butane, which can be used in making concentrated cannabis.

Defendant told one of the officers he was growing the marijuana for himself, his mother, and his father. Defendant's father passed away in May 2010, and his mother

---

[3] The cloning process involves taking a cutting from a female marijuana plant, dipping it in root toner, and placing it into a water solution or soil. The clone will be a match to the "mother plant" it was taken from.

3

moved to Reno, Nevada three weeks after defendant's father's death to live with defendant's older brother and receive rehabilitation services related to a stroke. Defendant said he was continuing to grow the marijuana for his mother in case she returned home.

Defendant told another officer that he was cultivating the marijuana for himself and his mother, and that the 42 clones technically were not his because he intended to give them to a third party.

Defendant told a special agent with the California Department of Justice, Bureau of Narcotics Enforcement that the two mason-type jars seized by law enforcement contained alcohol and marijuana, which he used as a medicinal rub that he sprayed on his body. The special agent was familiar with people using marijuana to make medicinal rubs.

Criminalist Mike Barnes testified as an expert in the analysis and manufacture of controlled substances, including the "extraction of marijuana." Barnes analyzed the contents of one of the jars seized during the search of defendant's property. The jar contained isopropanol, which is another name for rubbing alcohol, and small particulate matter with "morphological characteristics . . . consistent with marijuana." Isopropanol is a solvent that can be used to extract the resin containing Delta-9 tetrahydrocannabinol (THC), the active ingredient in marijuana. The process results in a "physical separation of the resin from the marijuana . . . ." The extracted resin is sometimes referred to as concentrated cannabis. Barnes analyzed the liquid in the jar for "the component Delta-9 THC, and it was present, so it was in the liquid, not necessarily on those little specs." Barnes agreed with the prosecutor's statement that "in the sense that there was THC in the liquid, the extraction process, at least as to that THC, was completed."

On cross-examination, Barnes was asked, "Did you look at or analyze anything that you considered to be concentrated cannabis?" Barnes responded, "Not in the form that I would expect to see concentrated cannabis," explaining that "[i]t's not generally

4

considered a liquid." He noted that that "the broad definition of concentrated cannabis is the separated resin, . . . so one could consider that, the extraction, as being concentrated cannabis or in the process of creating that," however, he "did not draw that conclusion."

Darrel Lemos, a member of the Siskiyou County Sheriff's Department Marijuana Eradication Unit, who was present during the search of defendant's property, opined that the solution found in the jars was consistent with concentrated cannabis as he understood it. The substance also was consistent with tinctures, which he understood to be a type of medicinal rub.

B.    *Defense Case*

Defendant testified in his own defense at trial. In the spring of 2010, he planted a medical cannabis garden on his property in Happy Camp. At the time, defendant, his three children, his mother and father, and his older brother were living on the property. Defendant planted 6 plants for his mother and 12 for himself. Defendant's mother had a stroke in December 2009, and his father died in May 2010. Before his father died, defendant cooked breakfast for his parents every morning, took them to the store when needed, and took "[b]asic care of the house and property." Three weeks after defendant's father died, defendant's mother moved to Reno to live with defendant's older brother and receive speech therapy.

Defendant was present when his property was searched. He told officers that the jars of liquid seized by law enforcement contained alcohol and marijuana leaves. He used the substance "for a medicinal rub, a spray." With respect to the plants, defendant told the officers "it was a medical grow for me and my parents and that we'd started it in 2007, that my dad had died in 2010, and that I was only growing for myself and for my mother." When officers told him that "they had found 40 something clones over next to the trash," he told them "they weren't clones, that they were trash just thrown in a bucket . . . with the rest of the debris." Defendant also asked the officers if giving the "supposed clones" to other people was against the law, and the officers said that it was.

5

During cross-examination, defendant acknowledged that his mother continued to live with his older brother outside California and had not been back to Happy Camp since leaving in 2010.

Richard Dean Rider, M.D., testified for the defense. Dr. Rider issued defendant medical marijuana recommendations for chronic knee pain in 2007, 2008, 2009, and 2010. According to Dr. Rider, in 2010, the amount of marijuana defendant could possess that would be reasonably related to his medical condition was six pounds of marijuana bud and the equivalent of 25 mature plants. A marijuana tincture was one way defendant could use marijuana.

Dr. Rider also issued medical marijuana recommendations for defendant's mother in 2006 and 2008 to deal with her arthritis and osteoporosis. While Dr. Rider had not seen defendant's mother since 2008, he would expect her conditions to worsen over time and "marijuana would have been a recommendation . . . [he] would concur with" in August 2010. The amount of marijuana defendant's mother could possess that would be reasonably related to her medical condition was the same as defendant: six pounds of marijuana bud and the equivalent of 25 mature plants. During cross-examination, Dr. Rider acknowledged the amount of marijuana he recommended was "based not so much on the current medical condition of those patients . . . , but rather the Safe Access Now guidelines."

C.     *Prosecution's Rebuttal*

The People called Officer Lemos in rebuttal. According to Lemos, Safe Access Now is a pro-marijuana-legalization organization. Lemos disputed defendant's testimony that the "supposed clones" were located next to the trash. According to Lemos, there were 41 clones soaking in water and a single clone in a small plant potter of soil, which was consistent with the cloning process. None of the clones were in the trash. At the time of the search, defendant told Lemos "that he was cultivating those clones, that he had cut them, planted them, and was cultivating them for a friend, so technically, they

6

were not his." According to Lemos, the 42 clones "absolutely" constituted a "cultivation in progress."

I

Defendant's Conviction for Manufacturing Concentrated Cannabis Must Be Reversed

For the manufacturing offense, the prosecutor relied on two theories: (1) the marijuana and isopropanol solution constituted concentrated cannabis; and (2) defendant was in the process of manufacturing concentrated cannabis. With respect to manufacturing, the jury was instructed in the language of CALCRIM No. 2330 in pertinent part as follows: "The defendant is charged in Count 1 with manufacturing, compounding, converting, producing, deriving, processing, or preparing concentrated cannabis, a controlled substance, in violation of Health and Safety Code section 11379.6.[**4**] [¶] To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant manufactured, compounded, converted, produced, derived, processed, or prepared a controlled substance, specifically concentrated cannabis, using chemical extraction or independent chemical synthesis; and, two, the defendant knew of the substance's nature or character as a controlled substance. [¶] . . . [¶] The People do not need to prove that the defendant completed the process of manufacturing or

---

**4** Subdivision (a) of section 11379.6 provides: "Except as otherwise provided by law, every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section 11054, 11055, 11056, 11057, or 11058 shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for three, five, or seven years and by a fine not exceeding fifty thousand dollars ($50,000)." The manufacture of concentrated cannabis by chemical extraction violates section 11379.6, subdivision (a). (*People v. Bergen* (2008) 166 Cal.App.4th 161, 168-169 (*Bergen*).) Although "[n]either 'concentrated cannabis' nor 'marijuana resin' is specifically mentioned in the statutory schedules of controlled substances[,] . . . they are both components of marijuana and are thus subsumed within the statutory definition of 'marijuana.' (§§ 11018 [defining marijuana to include its resin], 11006.5 [defining concentrated cannabis as the resin separated from marijuana].)" (*Ibid*.) Neither party argues otherwise.

producing a controlled substance. Rather, the People must prove that the defendant knowingly participated in the beginning or intermediate steps to process and make a controlled substance."

Defendant contends the solution of marijuana and isopropanol that was seized by law enforcement does not constitute concentrated cannabis as a matter of law. We agree.

Section 11006.5 defines concentrated cannabis as "the separated resin, whether crude or purified, obtained from marijuana." Defendant does not dispute that isopropanol is a solvent that can be used to separate resin from marijuana to make concentrated cannabis. Rather, he contends that there is no evidence he was doing so here, noting that the "solution had not been evaporated and was not found in a configuration intended to evaporate it."

The People respond that "expert witness Barnes testified that the combination of isopropol [*sic*] and particulate marijuana resulted in a chemical extraction of the resin containing Delta-9 THC from the marijuana. As defined by statute, 'concentrated cannabis' means 'the separated resin, whether crude or purified, obtained from marijuana.' [Citation.] Consistent with this definition, Barnes testified that the extracted liquid resin was concentrated cannabis."

As previously noted, section 11006.5 defines concentrated cannabis as "the separated resin, whether crude or purified, obtained from marijuana." While there was evidence that the resin had been chemically extracted/separated from the marijuana plant material, the resin remained in the alcohol solution. As such, it was not in a concentrated form. "Concentrated" means "(1) rich in respect to a particular or essential element: strong, undiluted; (2) intense . . . ." (Webster's 3d New International Dictionary (1993) p. 469.) The solution was none of these things. If anything, the separated resin was diluted by the solution and could not be considered concentrated unless and until the isopropanol evaporated or the resin was otherwise separated from it. We conclude the solution of isopropanol and marijuana seized from defendant's property does not

8

constitute concentrated cannabis as a matter of law.  Our conclusion is supported by Barnes's testimony that concentrated cannabis is "not generally considered a liquid." While Barnes did allow that "the broad definition of concentrated cannabis is the separated resin, . . . so one could consider that, the extraction, as being concentrated cannabis or in the process of creating that," he "*did not draw that conclusion*."  (Italics added.)

Where, as here, the prosecution presents its case to the jury on alternate theories, one of which is legally correct and one of which is legally incorrect, and the reviewing court cannot tell which theory the jury applied, the conviction must be reversed.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1122, 1129, 1130.)  A theory is legally incorrect "when the facts do not state a crime under the applicable statute," and the "rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground."  (*Id.* at p. 1129, fn. omitted.)  For example, in *People v. Green* (1980) 27 Cal.3d 1, 67, the issue "was whether 90 feet was sufficient asportation to satisfy the elements, or the 'statutory definition,' of kidnapping.  There was no insufficiency of proof in the sense that there clearly was evidence from which a jury could find that the victim had been asported the 90 feet.  Instead, [the court] held that the distance was '*legally* insufficient.' "  (*Guiton, supra,* 4 Cal.4th at p. 1128, quoting *Green, supra,* 27 Cal.3d at p. 67.)  Likewise, at issue here is whether the solution of isopropanol and marijuana constituted concentrated cannabis as that term is defined in section 11006.5. There was no insufficiency of proof in the sense that there clearly was evidence from which a jury could find that defendant manufactured that solution.  Instead, we concluded above that the solution is "legally insufficient," in that it does not constitute concentrated cannabis as a matter of law.  Because there is no indication in the record as to which theory the jury based its verdict, reversal is required.

The next issue we must address is whether there is sufficient evidence to support the prosecution's alternative theory -- that defendant was in the process of manufacturing

9

concentrated cannabis -- because if the evidence is insufficient to support a conviction on the alternative theory, defendant cannot be retried for manufacturing because retrial is barred under the double jeopardy clause. (*Burks v. United States* (1978) 437 U.S. 1, 11 [57 L.Ed.2d 1, 9-10].) If the alternative theory fails for lack of evidence, we not only must reverse the manufacturing conviction, we must direct the trial court to enter a judgment of acquittal on that charge. (See *People v. Llamas* (1997) 51 Cal.App.4th 1729, 1741-1743.)

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)

Defendant argues the evidence not only fails to show that he produced concentrated cannabis, it fails to show he "was making any attempt to do so." According to defendant, the evidence shows only "that [he] had dissolved marijuana in rubbing alcohol, and that this solution continued to contain the actual plant material of marijuana. This solution had not been evaporated and was not found in a configuration intended to evaporate it." In their respondent's brief, the People argue only "that the extracted liquid resin [contained in alcohol solution] was concentrated cannabis." They do not assert, as they did at trial, that even if defendant had not yet produced concentrated cannabis, he was in the process of doing so. Because this theory was submitted to the jury at trial, we must address it.

10

As previously discussed, Barnes testified that isopropanol is a solvent that can be used to extract the resin from marijuana, and the process results in a "physical separation of the resin from the marijuana . . . ." But, as defendant correctly notes, "[t]he question in this case is not whether alcohol *could be* used as a solvent or whether concentrated cannabis *could be* produced with alcohol but whether [defendant] actually *was* producing concentrated cannabis with alcohol." While Barnes allowed that under "the broad definition of concentrated cannabis . . . one could consider that, the extraction, as being concentrated cannabis or in the process of creating that," he "did *not* draw that conclusion." (Italics added.) To the extent Barnes can be understood to state that while he did not consider defendant to be in the process of making concentrated cannabis, one nonetheless could reach that conclusion, Barnes's testimony is insufficient to support defendant's conviction because there are no facts to support it. (See *Barragan v. Lopez* (2007) 156 Cal.App.4th 997, 1007 [expert's opinion only as good as the facts upon which it is based].)

Conspicuously absent from the record in this case is any evidence on the manufacturing process itself. While the prosecution offered evidence that concentrated cannabis could be manufactured using isopropanol; it failed to offer any evidence to how that is done. *Bergen* illustrates the importance of such evidence in evaluating the physical evidence. There, "deputies found eighteen 12- to 13-inch-long white plastic tubes, similar to PVC pipe [in the defendant's garage]. In the same area of the garage deputies found bottles of butane, including nine full cases of butane. They also found approximately 1,000 glass vials and a few glass bowls containing a greenish residue." (*Bergen, supra*, 166 Cal.App.4th at p. 165.) The prosecution's expert opined that the defendant was operating a " 'honey oil' " extraction lab. (*Ibid.*) Unlike this case, the expert described the process of manufacturing concentrated cannabis as follows: "One-and-a-half-inch-round solid plastic piping is cut into 18-inch lengths. Solid caps are placed on both ends of the 18-inch tubes. A screw-off cap is placed on the top and a

11

single hole is drilled into the top cap. Five to seven small holes are then drilled into the bottom cap and a filtering device inserted. Filters akin to coffee filters are used for this purpose. [¶] Marijuana is then loosely packed into the tube and the top cap screwed onto the tube. The tube is placed upright in a stand. A bottle of butane is inserted into the single hole in the top cap and poured slowly into the tube to allow the butane to draw the oils down through the tube. Butane is a solvent and it extracts the resin from the plant material as the butane flows from the top of the tube to the bottom. A glass dish is placed under the upright tube to collect the filtered residue as it drips through the small holes in the bottom of the tube. This resin extraction and filtering part of the process takes approximately 15 minutes. It requires another 20 minutes or so for the butane to evaporate, leaving the amber colored concentrated cannabis known colloquially as 'hash oil' or 'honey oil.' When all the butane has safely dissipated, the 'honey oil' is then poured into individual glass vials." (*Id.* at pp. 165-166.) The expert's testimony assisted the trier of fact in evaluating the significance of the physical evidence found in the garage. The expert's testimony not only explained the manufacturing process, but made plain that the process concluded once the butane evaporates. Prior to that point, the manufacturing was still in progress. No such evidence was introduced here.

Absent such evidence, it is difficult to conceive of how a trier of fact reasonably could conclude defendant was in the process of producing or manufacturing concentrated cannabis. This is especially true given Officer Lemos's testimony that the substance contained in the jars was consistent with a tincture, which he understood to be a type of "topical rub,"[5] Dr. Rider's testimony that a marijuana tincture was one way defendant could use marijuana, and defendant's testimony that he did, in fact, use the substance "for

---

[5] Lemos also testified that he believed the substance was also consistent with concentrated cannabis. We have concluded, however, that the substance is not concentrated cannabis as a matter of law.

a medicinal rub, a spray." While officers found cans of butane, which can be used to make concentrated cannabis, in the trailer where they found the jars of the solution in question, there is no evidence defendant was using the butane to produce concentrated cannabis. In short, there is no evidence whatsoever that defendant was using the solution contained in the jars for anything other than a medicinal rub or that he was in the process of converting it into concentrated cannabis. Because there is insufficient evidence to support a finding defendant was in the process of producing concentrated cannabis, the People are precluded from retrying him for manufacturing concentrated cannabis.[6]

## II
### Any Error in Failing to Define the Term "Primary Caregiver" in Connection with the Cultivation Offense Was Harmless Beyond a Reasonable Doubt Because No Juror Reasonably Could Conclude Defendant Was a Primary Caregiver

Defendant contends the trial court erred in failing to define the term "primary caregiver" where, as here, defendant "relied on his status as a primary caregiver to his mother in arguing that the amount of marijuana he cultivated was reasonable." As we shall explain, any error was harmless beyond a reasonable doubt.

Section 11358 states: "Every person who plants, cultivates, harvests, dries, or processes any marijuana or any part thereof, except as otherwise provided by law, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code." Pursuant to the Compassionate Use Act (§ 11362.5), "Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).) " '[P]rimary caregiver' means the individual designated by the person

---

[6] Given our conclusion, we need not consider defendant's claims that the trial court erred in failing to (1) define "concentrated cannabis" for the jury, or (2) instruct the jury on the defenses of mistake of fact or mistake of law in connection with the manufacturing offense.

13

exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person."  (§ 11362.5, subd. (e).)

Here, the jury was instructed in the language of CALCRIM No. 2370 in pertinent part as follows:  "The Compassionate Use Act allows a person to possess or cultivate marijuana for personal medical purposes or as a primary caregiver of a patient with a medical need when a physician has recommended or approved such use.  [¶]  In this case, the question whether the defendant was the primary caregiver of a patient with a medical need when a physician has recommended or approved such use pertains only to the defendant's mother, Ms. Judy Curtis.  [¶]  The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs."  CALCRIM No. 2370 also contains the following bracketed language, which was neither requested by parties nor given to the jury in this case:  "A *primary caregiver* is someone who has consistently assumed responsibility for the housing, health, or safety of a patient who may legally possess or cultivate marijuana."

In this case, we need not, and do not, reach the issue of whether the trial court erred in failing to instruct the jury on the definition of primary caregiver.  As we will explain, any error in failing to give such an instruction was harmless under the applicable standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].  (*See People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 ["a trial court's failure to instruct on an element of a crime is federal constitutional error [citation] that requires reversal of the conviction unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict" (italics omitted)].)

In *People v. Mentch* (2008) 45 Cal.4th 274 (*Mentch*), our Supreme Court concluded that to be a primary caregiver within the meaning of section 11362.5, subdivision (e), an individual must show that "he or she (1) *consistently* provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana."

14

(*Mentch*, at p. 283, italics added; *id*. at p. 281, fn. 4.) The term consistently "suggests an *ongoing* relationship marked by regular and repeated actions over time," and primary caregiver status "requires an *existing*, established relationship." (*Id.* at pp. 283-284, italics added.)

Here, there was no evidence defendant consistently provided caregiving to his mother at the time his marijuana plants were seized insofar as she had moved to Reno three months earlier to live with defendant's older brother and had never returned. Thus, there was no ongoing or existing caregiving relationship as contemplated under *Mentch*. (*Mentch, supra*, 45 Cal.4th at pp. 283-284.) While defendant told officers he continued to cultivate the six marijuana plants he planted for his mother following her departure in case she returned, the evidence established she had been gone for three months, and defendant offered no evidence to support his stated belief she might return. (See *People v. Mower* (2002) 28 Cal.4th 457, 477, 481 [the defendant has the burden of proof as to the facts underlying the defense of the Compassionate Use Act and is required to raise a reasonable doubt].) The mere theoretical possibility that she would return at some undisclosed point in the future is insufficient to raise a reasonable doubt that defendant's cultivation was unlawful. Accordingly, any error in failing to instruct the jury as to the meaning of the term primary caregiver was harmless beyond a reasonable doubt.

III

The $145 Laboratory Analysis Fee Must Be Reduced to $50

Defendant contends, and the People concede, that the $145 laboratory fee imposed pursuant to section 11372.5 must be reduced to $100 because that section only imposes a $50 fee for each separate offense, and defendant only suffered two convictions. We agree the fee must be reduced; however, in light of our determination that defendant's manufacturing conviction must be reversed, we conclude the fee must be reduced to $50.

Section 11372.5, subdivision (a) states in pertinent part: "Every person who is convicted of a violation of Section . . . 11358 . . . [or] 11379.6 . . . of this code . . . shall

15

pay a criminal laboratory analysis fee in the amount of fifty dollars ($50) for each separate offense." Defendant was convicted of violating both sections 11358 and 11379.6, but as detailed above, we have determined his conviction for violating section 11379.6 (manufacturing concentrated cannabis) must be reversed. Thus, only one conviction remains. Accordingly, the laboratory analysis fee must be reduced to $50.

## IV
### The $145 Drug Program Fee Must Be Reversed and the Case Remanded for a Determination of Whether Defendant Has the Ability to Pay

Finally, defendant contends that, although the trial court had the discretion to impose the $145 drug program fee, it imposed it because it erroneously believed it was required to do so. It appears that defendant is correct.

At sentencing, the trial court inquired as to defendant's income and ability "to make payments to the court." Both defendant's trial counsel and defendant indicated defendant's ability to pay was minimal because was he disabled and unemployed. The trial court accepted their representations and indicated that it was "not going to require the pre-sentence report fee of paragraph 28 so that's stricken. The booking fee is stricken, and I'm not going to require reimbursement for appointed counsel fees." The court also struck the probation monthly fee after being advised that "[i]t's discretionary based on the ability to pay . . . ." The court then imposed the remaining recommended fines and fees, including the $145 drug program fee, stating "I believe the others are all mandatory."

The drug program fee was imposed pursuant to section 11372.7, which provides in pertinent part: "(a) Except as otherwise provided in subdivision (b) or (e), each person who is convicted of a violation of this chapter shall pay a drug program fee in an amount not to exceed one hundred fifty dollars ($150) for each separate offense. . . . [¶] (b) *The court shall determine whether or not the person who is convicted of a violation of this chapter has the ability to pay a drug program fee.* If the court determines that the person

16

has the ability to pay, the court may set the amount to be paid and order the person to pay that sum to the county in a manner that the court believes is reasonable and compatible with the person's financial ability. . . . *If the court determines that the person does not have the ability to pay a drug program fee, the person shall not be required to pay a drug program fee*." (Italics added.)

As a preliminary matter, we reject the People's assertion that defendant forfeited this issue by failing to raise it in the trial court. " 'A ruling otherwise within the trial court's power will nonetheless be set aside where it appears from the record that in issuing the ruling the court failed to exercise the discretion vested in it by law. [Citations.]' [Citation.] 'Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal. [Citations.]' [Citation.]" (*People v. Downey* (2000) 82 Cal.App.4th 899, 912.) The record supports defendant's claim that the trial court did not believe it had any discretion with respect to the imposition of the drug program fee. Accordingly, the issue is not forfeited. (*In re Sean W.* (2005) 127 Cal.App.4th 1177, 1181-1182.)

Turning to the merits, "[w]here, as here, a sentence choice is based on an erroneous understanding of the law, the matter must be remanded for an informed determination. [Citations.]" (*People v. Downey*, *supra*, 82 Cal.App.4th at p. 912.) Accordingly, we shall reverse the drug program fee and remand the matter to the trial court for a determination of defendant's ability to pay it.

### DISPOSITION

Defendant's conviction for manufacturing concentrated cannabis (§ 11379.6) is reversed. The drug program fee (§ 11372.7) is reversed. The case is remanded to the trial court with directions to determine whether defendant has the ability to pay that fee. The judgment is modified to reduce the laboratory analysis fee (§ 11372.5) to $50. In all other respects, the judgment is affirmed. The trial court is directed to prepare an

17

amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

                                         \_\_\_\_\_BLEASE_____, Acting P. J.

We concur:

        \_\_\_\_\_DUARTE_____, J.

        \_\_\_\_\_HOCH_____, J.